Joseph Hotze v. Commissioner.
Hotze v. Commissioner
Docket No. 14482.
United States Tax Court
1949 Tax Ct. Memo LEXIS 22; 8 T.C.M. (CCH) 1015; T.C.M. (RIA) 49277; November 30, 1949
*22 Petitioner, during the taxable years 1934 to 1939, inclusive, derived income from engaging in an illegal enterprise of "banking"numbers pools and horse play, a considerable amount of which income he failed to return for income tax purposes. Held: ( 1) Petitioner filed false and fraudulent income tax returns for the taxable periods involved, with intent to evade tax; (2) A fraud penalty of 50 per centum of the total deficiency to be determined under Rule 50, in accordance with our findings herein, allowed. Richard L. Gottlieb, Esq., 85 Devonshire St., Boston, Mass., for the petitioner. Melvin L. Sears, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves income tax deficiencies and fraud penalties for the calendar years 1934 to 1939, inclusive, as follows: Income Tax
Fraud
Deficiency
Penalty
1934
$ 11,385.30
$ 5,692.65
1935
37,400.85
18,700.43
1936
59,163.00
29,581.50
1937
62,848.75
31,424.38
1938
86,961.86
43,480.93
1939
113,937.68
56,968.84
The issues presented are: (1) Did petitioner file false or fraudulent income tax returns with the intent to evadetax *23 for each of the calendar years 1934 to 1939, inclusive? (2) Did the respondent use a proper basis for determining the amount of additional taxable income which petitioner failed to report in his tax returns for the respective calendar years involved? (3) Is any part of the deficiency due for any calendar year, 1934 to 1939, inclusive, due to fraud with intent to evade the tax? Findings of Fact Petitioner's income tax returns for each of the years 1934 to 1939, inclusive, were filed with the collector of internal revenue for the district of Massachusetts. During the taxable periods involved, petitioner was engaged in the gambling business. Petitioner acted as "banker" with respect to wagering on numbers pools and horse play. He also had a share interest in three newspaper pools, and insured the operators of so-called "Treasury Balance Lotteries." With respect to wagering on the numbers pools and horses, petitioner accepted or "banked" the bets or "plays" made by or through his agents or so-called "50 per cent men." As to the so-called "Newspaper Pools," petitioner had a share interest in the profit of the pools and also bought unsold numbers. With respect to the so-called *24 "Treasury Balance Lotteries," petitioner insured the operators of the lotteries in return for an agreed premium of 10 per cent. The "play" on the numbers or horses was telephoned in or turned in daily by the "50 per cent men," either to petitioner's office or to the prearranged places where his employees picked it up. At petitioner's office the "play" was tabulated and pay-off sheets prepared daily. A pay-off sheet listed on one side the "play" on which the "bank" had won, and on the other side the "play" on which the "bank" had lost. By subtracting one from the other, it was determined whether a "50 per cent man" had a net win or loss for the day. Similar sheets were kept each day for each of the "50 per cent men." These pay-off sheets were kept for three to four months and then destroyed. The pay-off sheets were the only records kept at the petitioner's office. The prices for winning numbers or horses, known as "bets," were generally paid from cash collections in the hands of the "50 per cent men." If his cash on hand was insufficient, additional cash was obtained by him from the employees at petitioner's office. That supplemental cash was obtained by petitioner's employees from *25 cash collections turned in by other "50 per cent men," or by cash or check. The expenses of the "50 per cent men" were charged to petitioner's "book" as "hits," and the expenses of petitioner's office were charged to the "books" of the "50 per cent men" as "hits." Protection from police interference may have been paid and, if so, such payments were charged as "hits" on the "books." During the taxable years, the money wagered was picked up mostly by a brother of petitioner, Eddie Hotze, Harry Portnoy and Louis Hodess, employees in petitioner's office. Eddie Hotze tabulated the money and made it ready for deposit. Checks received for "plays" were deposited in a bank account maintained by or for petitioner. The change and small bills were converted into bills of larger denomination and delivered to petitioner. Petitioner's banking was largely done under aliases. Petitioner held large sums in the form of bank drafts and cashier's checks for a period of years. Petitioner filed income tax returns for each of the years 1934 to 1939, inclusive, in which he reported income as follows: 1934
1935
1936
1937
1938
1939
Salaries and Comm.
$8,725.00
$11,650.00 $ 5,900.00
$18,200.00 $17,420.00 $ 1,000.00
Interest
1,795.00
2,397.50 2,117.50
2,100.00 2,100.00 796.25
Cap. Gain
3,572.58
(1,011.61)
13,493.42
(2,000.00)
(168.77)
3,500.46
Dividends
2,669.12
3,595.00 8,680.00
6,801.01 2,854.60 2,483.50
Wagering
24,060.56
*26 The amounts shown under the heading of "Salaries & Comm." for each of the years 1934 to 1938, inclusive, were furnished by petitioner to his accountant as income from gambling operations, and were used by the accountant without verification. The item of $1,000 shown on the 1939 return was salary received by petitioner from the Malden Bowling Arena. The item of $24,060.56 shown on the 1939 return as "Wagering" consisted of the following: Income from $8,000 Pool
$ 2,634.74
Insurance on $8,000 Pool
1,489.54
Income from $7,800 Pool
2,846.00
Income from $4,000 Pool
2,090.28
Income from Numbers and Horse
Play
15,000.00
$24,060.56 The item of $15,000 income from numbers and horse play was an estimated figure. No savings accounts were disclosed to the accountants preparing petitioner's income tax returns for the years 1934 to 1939, inclusive, and no interest on savings accounts was included in said returns. On August 31, 1939, petitioner's Office at 238A Elm Street, Somerville, Massachusetts, was raided by the Massachusetts State Police pursuant to a search warrant issued by the Somerville District Court of Massachusetts. All persons on the premises, including *27 petitioner, were arrested, and the contents of the office were seized. On the same night petitioner's home at 54 Willow Crescent, Brookline, Massachusetts, was raded by the Massachusetts State Police pursuant to a search warrant issued by the Brookline District Court of Massachusetts. Among the materials seized at petitioner's office were the "pay-off" sheets for the months of June, July and August 1939. Among the materials seized at petitioner's home were envelopes containing the daily "tabs" adding machine tapes, duplicate deposit slips and "win and loss" slips on horses and numbers for the months of March, April and May 1939. No other books of account were found on the office premises. Petitioner pleaded guilty before the Massachusetts court to the following charges: (a) setting up and promoting a lottery; (b) being found in a place with apparatus, books or other devices for registering bets upon the result of a trial or contest of speed or endurace of beasts; (c) conspiring to keep a room for registering bets upon the result of a trial or contest of speed or endurance of beasts; and (d) conspiring to set up or promote a lottery for money, and was fined and imprisoned therefor. *28 Representatives of the respondent were given access to the materials seized in the two aforementioned raids. Among the records were "pay-off sheets" for the months of June, July and August 1939, for the "books" of 33 principal agents ("50 per cent men") who were "banking" their "books" with petitioner at the time of the raids. The respondent's representatives took the statements under oath from the 36 principal agents as to their dealings with petitioner during the years 1934 to 1939, inclusive. From such statements an analysis was made by the respondent indicating horse and numbers play booked, income to principal agent and income to petitioner therefrom, for the years 1934 to 1939, inclusive. Respondent also made a computation from such statements of the total amount there indicated as paid for protection from police interference out of the proceeds of the numbers and horse pools. The notice of deficiency was based on such computation. Petitioner, during the taxable periods involved, received income from interest on savings accounts and from his gambling transactions, as follows: 1934
$ 34,988.94
1935
49,517.36
1936
56,050.68
1937
57,719.08
1938
77,161.77
1939
116,444.35
*29 Petitioner failed to report income for the calendar years 1934 to 1939, inclusive, in the following amounts: 1934
$26,263.94
1935
37,867.36
1936
50,150.68
1937
39,519.08
1938
59,741.77
1939
92,383.79
Consents fixing the period of limitations upon assessment of income and profits tax were executed by petitioner, extending the statute of limitations as to the income returned for the calendar year 1939 to June 30, 1944, prior to which time the notice of deficiency was duly issued. Petitioner pleaded guilty, was fined and imprisoned for willfully, knowingly and feloniously attempting to evade and defeat his income taxes for the calendar years 1936 to 1939, inclusive. Petitioner filed false and fraudulent income tax returns for each of the years 1934 to 1939, inclusive, with intent to evade tax. A part of the deficiency with respect to each of said taxable years is due to fraud with intent to evade tax. Opinion This proceeding involves deficiencies and fraud penalties against petitioner for failure to report income from interest on savings accounts and income allegedly derived from certain gambling transactions in each of the taxable years 1934 to *30 1939, inclusive. Approximately 70 witnesses were sworn in this proceeding and the transcript of the testimony covers 1,571 pages. A large amount of documentary proof was also offered. No brief, however, has been filed herein on behalf of petitioner. The only excuse given by counsel for petitioner for failure to file any brief is that petitioner was without financial means to purchase a transcript of the testimony. Petitioner offered no evidence except his own testimony and such evidence as his counsel developed on cross-examination of the witnesses produced by the respondent. The contentions of petitioner, so far as we are able to ascertain them without the aid of any briefs, are that his gambling operations were carried on under a partnership arrangement with three other individuals, and that he was entitled to only a fourth of the income from such operations; that the method by which the respondent determined the amount of the deficiencies in his income was based upon surmise and conjecture and did not reflect his true income; and that the assessment of the deficiencies is barred by the statute of limitations. The only evidence in this record that the gambling operations were *31 carried on by petitioner in partnership with others is the unsupported testimony of petitioner. Petitioner in his petition and amended petition filed herein made no such claim. The contention of the existence of a partnership was made for the first time at the trial in this proceeding. In no tax return filed by petitioner for the taxable periods involved was there any indication of the existence of a copartnership with respect to numbers pools and horse play "banked" by petitioner. Each of his accountants, who prepared his income tax returns for such periods, testified that petitioner never disclosed the existence of a partnership to them, except in connection with certain so-called "newspaper pools" and a "Treasury balance lottery," which were disclosed on the returns. Each of the alleged other copartners categorically denied any partnership association with petitioner. The unsupported testimony of petitioner can not prevail against such a preponderance of evidence indicating that no partnership existed in fact. Such income as is shown to result from the gambling operations in the numbers pools and horse play was the income of petitioner as sole proprietor. Petitioner's challenge *32 of the method of computing the amount of the dollar deficiency gives rise to greater concern. Petitioner kept no permanent books of account. Such records as were kept were maintained on a daily basis and stored for a period of three months and then destroyed. Ordinarily in cases where no books of record are available, income is based upon evidence which reflects the increase in net worth over specified periods, or upon the basis of bank deposits, which, in lieu of an adequate explanation, are charged as income. The respondent concedes that the usual method for computing income was not available here because of the extensive use by petitioner of aliases, the method used in handling his bank affairs, and the practice of petitioner in "floating" checks, bank drafts and cashier's checks in substantial sums for periods of over three years. This concealment of assets is further aggravated by the established practice of petitioner in withholding cash received in the normal course of business from deposits in banks. The method adopted by the respondent in determining the deficiencies was to take the testimony of the "50 per cent men" who, the seized records disclosed, had "banked" their play *33 with petitioner over the taxable years involved, as to the amounts of "play" they daily turned over to petitioner. The net amount of the "play" was divided on the agreed percentage basis, usually 50 per cent, and constituted the income of the principal agents and that of petitioner. The average daily net income was projected over the respective periods during which each agent "banked" with petitioner, and furnished the basis of determining the aggregate income charged to petitioner. Since the testimony of the agents was not based upon records but upon their best recollection of the amounts each received as his share of the daily net receipts from the gambling operations carried on with petitioner, the testimony on which the respondent determined the dollar deficiency and the testimony of those agents given at the hearing present many conflicts and irreconcilable differences. The respondent argues that the method used was the best available under the existing circumstances and, therefore, he was justified in adopting it here. We agree, and think it a reasonable one, at least where, as here, the petitioner has pleaded guilty to the criminal charge of willfully, knowingly and unlawfully *34 attempting to evade and defeat his income taxes for four of the six taxable years here involved. However, the amount of the dollar deficiency for each of the taxable years, as set forth in the respondent's notice, varies in a considerable amount from the income computed on the basis of the testimony of the witnesses offered by the respondent on the hearing in this proceeding upon which our findings here are predicated. This is due in part to the fact that the respondent was unable to produce, on the hearing, all of the witnesses upon whose testimony he computed his deficiencies, and, in part, to the fact that the testimony of witnesses at the hearing varied materially from their previous statements made under oath to the respondent prior to the determination of the deficiency. On the evidence we have also found as a fact the amount of income from interest on savings accounts and from gambling transactions received by petitioner in the respective taxable years involved from the evidence contained in this record. We have further found the amount of income which petitioner failed to report in the respective taxable years. We conclude that petitioner filed false or fraudulent income *35 tax returns with intent to evade tax in each of the taxable years 1934 to 1939, inclusive. A part of the deficiency with respect to each of said taxable years is due to fraud with intent to evade tax. Petitioner is liable for the 50 per cent fraud penalty prescribed by section 293 (b) of the Internal Revenue Code. The assessment of the deficiencies was not barred by the statute of limitations. The amounts of the contested deficiencies will be recomputed in accordance with our findings herein, under Rule 50, and the fraud penalties of 50 per cent of the respective deficiencies so determined are allowed and will be added. See Estate of Joseph Nitto, 13 T.C. - (promulgated November 30, 1949). Decision will be entered under Rule 50.